Argued and submitted March 3, affirmed on petition and cross-petition
May 3, 2000

## Jack JOHNSON
### and Patricia Johnson,
*Respondents - Cross-Petitioners,*

*v.*

## CITY OF LA GRANDE,
*Petitioner - Cross-Respondent.*

(LUBA No. 99-053; CA A108908)

1 P3d 1036

Martin Birnbaum argued the cause and filed the brief for petitioner - cross-respondent.

Mark Tipperman argued the cause and filed the brief for respondents - cross-petitioners.

Jeffrey G. Condit and Miller Nash LLP filed the brief *amicus curiae* for League of Oregon Cities.

Linder, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

DEITS, C. J.

## DEITS, C. J.

The City of La Grande adopted a decision to annex a 155-parcel area, including respondents' property, without an election pursuant to ORS 222.170. Respondents appealed to LUBA, which remanded the decision to the city. The city petitions and respondents cross-petition for our review. We affirm.

We begin by setting out the relevant statutes. ORS 222.170(1) provides for annexation without an election

"if more than half of the owners of land in the territory, who also own more than half of the land in the contiguous territory and of real property therein representing more than half of the assessed value of all real property in the contiguous territory consent in writing to the annexation of their land in the territory and file a statement of their consent with the [city] legislative body * * *[.]"

ORS 222.170(2) also allows property to be annexed without an election

"if a majority of the electors registered in the territory proposed to be annexed consent in writing to annexation and the owners of more than half of the land in that territory consent in writing to the annexation of their land and those owners and electors file a statement of their consent with the [city] legislative body * * *[.]"

Under ORS 222.173, the consents are valid for a period of one year, unless the period is waived in writing by the persons granting the consents. Under ORS 222.175, a city must provide the owners or electors from whom it solicits consents with specified information, constituting what the parties describe as an "annexation plan." *See also Skourtes v. City of Tigard*, 250 Or 537, 444 P2d 22 (1968).

The foregoing statutes predate 1991. That year, the legislature adopted Oregon Laws 1991, chapter 637, through which two additional relevant provisions were enacted. The first, ORS 222.115, provides:

"A contract between a city and a landowner relating to extraterritorial provision of service and consent to eventual annexation of property of the landowner shall be recorded

and, when recorded, shall be binding on all successors with an interest in that property."

The other is the following language that section 6 of the 1991 Act added to ORS 199.487(2):

"Notwithstanding ORS 199.490(2)(b), 222.173(1), 222.175 or any other requirement for obtaining consent to annexation, a city or district may use a consent to annexation contained in contracts authorized by ORS 198.869 or 222.115 in formulating annexation proposals or petitions under ORS 198.855, 199.490(2), 222.125 or 222.170 for properties whose owners have signed such consents to annexation."

The proposed annexation in this case involves an area to which the city has been providing extraterritorial water and sewer services since the early 1970s. The area has been the scene of expanding residential development between that time and 1999, when the city made the present decision. It appears from the parties' briefs and arguments that some of the consents to annexation that the city procured were in the form of contractual exchanges for city services. Of those, some were obtained before the enactment of ORS 222.115, and some were obtained after the statute's adoption. It also appears that some of the consents were obtained pursuant to the procedures of ORS 222.170 *et seq.* rather than as contractual exchanges for the extraterritorial municipal services.

Beyond those undifferentiated facts, however, neither the parties nor the record have provided us with the specific numbers of consents that come within the respective categories or of the total number of consents from the combined sources that would be necessary to support the city's action. This lack of specific information becomes a problem, because LUBA's remand was based on its acceptance of five of the many specific contentions that respondents made to it. The various bases for LUBA's disposition could affect the different kinds of consents in different ways, both as to matters of law and fact. However, the city now challenges only one of the five rulings.[1] It is not presently discernible to us whether the

---

[1] The city makes three assignments of error, but all of them pertain to the same ruling.

issue that the city raises will retain any potential disposi-
tional significance on remand, in light of the other grounds
for the remand that the city does not challenge, and in light of
any factual findings that the city makes on remand in con-
nection with those other issues. Nevertheless, the issue that
the city does raise on remand can be resolved as a matter of
law, given the information that is available to us. The same is
true of two of the three assignments that respondents make
in their cross-petition. Given the substantial possibility that
they will arise on the remand to the city, we will address all
but one of the issues that the parties raise.

The city challenges LUBA's ruling that, before the
enactment of ORS 222.115 in 1991, cities had no authority to
require consents to annexation in exchange for providing
extraterritorial services. LUBA relied on our statement in
*Bear Creek Valley Sanitary v. City of Medford*, 130 Or App 24,
30-31, 880 P2d 486, *rev den* 320 Or 493 (1994):

"In sum, reading ORS 222.115 in the context of the 1991
Act through which it was adopted, we interpret the statute
to be the defining source of and limitation on city authority
to obtain consents to annexation in exchange for extrater-
ritorial services."

The city appears to share LUBA's understanding that that
statement implies that there was no authority for cities to
enter into such contracts before the adoption of the 1991 Act,
but it argues that *Bear Creek* was wrong as a matter of law
and historical fact and was contrary to our earlier decision in
*Bell v. City of Corvallis*, 25 Or App 821, 826, 551 P2d 125, *rev
den* (1976), in so holding.

We do not agree with the city and LUBA as to what
the statement in *Bear Creek* means. The statement was made
in response to the argument in that case, that ORS 222.115
and other provisions were intended "as a mere legislative rec-
ognition of an existing practice." *Id.* at 30. We expressly noted
that the "fact that a practice predates legislative action does
not, of course, preclude the legislature from regulating it." *Id.*
at 30 n 6. In that context, and by its terms, our statement in
*Bear Creek* is not correctly understood to mean that cities had
no *previous* authority to enter into agreements requiring con-
sents to annexation in exchange for city services before the

enactment of ORS 222.115. Rather, the statement means that the *future* exercise of that authority and the conditions surrounding such contracts were made subject to the requirements of ORS 222.115 and the other pertinent provisions of the 1991 Act.

As noted, respondents raise three assignments in their cross-petition. The first is that the procedures followed by the city were "coercive" and, hence, unconstitutional under the rationale of *Hussey v. City of Portland*, 64 F3d 1260 (9th Cir 1995). In our view, that argument is both fact-dependent under its own terms and is also contingent for its continuing relevance on which of the various putative consents remain relevant to the case at all after the proceedings on remand. Moreover, an *affirmative* answer to respondents' argument could not be independently decisive at this point, in light of the unchallenged bases for LUBA's remand and the other attendant circumstances. Under those circumstances, we decline to reach a constitutional issue that may well never become essential to the ultimate decision of the case.

In their second assignment, respondents argue that LUBA erred by holding that the property of nonconsenting owners may be included in an area annexed on the basis of consents procured pursuant to ORS 222.115. LUBA said:

> "We need not look to legislative history to resolve this assignment of error, because the statute is clear on its face. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). ORS 199.487(2) permits the city to use consents under ORS 222.115 in determining whether it has the required number of consents to eliminate the election requirement. An annexation, with or without an election, may be accomplished without the consent of all the property owners within the annexed territory."

Respondents assert:

> "LUBA based its holding on the so-called plain meaning of ORS 222.115. LUBA failed to consider or analyze the Respondents' contention that the plain meaning of L. 1991, Chapt. 637; ORS 199.487(2) makes it very clear that contractual consents cannot be used for an annexation of nonconsenting owners.

"For the purpose of deciding this cross-assignment of error, ORS 199.487(2) is the statute of paramount importance. Although ORS 222.115 authorizes the use of contracts with consents to annexation and makes the contract consents binding if recorded, ORS 199.487(2) is the only statute which arguably authorized the use of the contract consents, in the [city's] decision whether an annexation may proceed under ORS 222.170.

"More significantly, ORS 199.487(2) explicitly prohibits the use of consents in contracts for the annexation of property owned by individuals who have not signed contract consents.

"ORS 199.487(2) which is titled '[Boundary] Commission authority to initiate minor change; nonapplicability of certain boundary change procedures; effect of commission action' provides in relevant part:

" 'Notwithstanding ORS 199.490(2)(b), 222.173(1), 222.175 or any other requirement for obtaining consent to annexation, a city or district may use a consent to annexation contained in contracts authorized by ORS 198.869 or 222.115 *in formulating annexation proposals or petitions* under ORS 198.885, 199.490(2), 222.125 or 222.170 *for properties whose owners have signed such consents to annexation.*'

"There are two problems with LUBA's analysis of ORS 199.487(2).

"(i) First, there is the following limitation in ORS 199.487(2): '[I]n formulating annexation proposals or petitions'—there is nothing in ORS 199.487(2) which grants authority to use contracts for the actual approval of an annexation by municipal ordinance or election under ORS 222.170. ORS 199.487(2) only authorizes the use of contracts for the preliminary steps of *formulating* annexation proposals or petitions;

"(ii) Second, there is the following qualification in ORS 199.487(2): '[F]or properties whose owners have signed such consents to annexation' ('Contract Consent Limitation')—There is nothing in ORS 199.487(2) which confers authority to use contract consents for the annexation of property owned by individuals who have not signed contract consents. Indeed, the Contract Consent Limitation was a very specific qualification added to HB 3498 (enacted

as L. 1991, Chapt. 637) to ensure that owners of property not subject to contracts, would not be included in any annexation authorized by the foregoing provision.

"It appears that the Contract Consent Limitation was introduced to ensure that ORS 199.487(2) spelled out the legislature's intent that the statute was not intended to authorize the annexation of properties which were not the subject of contracts with consents." (Emphasis respondents'; citation to record omitted.)

Assuming that the 1991 amendment to ORS 199.487(2) could mean what respondents understand it to mean, if it were read in isolation, it cannot be understood to have that meaning when the statutory context is taken into account. ORS 199.487(2) does not purport to establish substantive requirements for annexation proposals or petitions, or to establish territorial limits on the property that may ultimately be annexed, or to make the territorial scope of a proposal or petition separable from that of the consummated annexation. Rather, ORS 199.487(2) expressly incorporates four other statutes—ORS 198.855, ORS 199.490(2), ORS 222.125 and, the applicable statute here, ORS 222.170—that do govern those matters under the various circumstances to which they pertain. None of the four statutes contemplates the type of fundamental territorial deviation between the annexation petition or proposal and the consummated annexation that respondents ascribe to ORS 198.487(2); indeed, three of the four provide for the proclamation of the annexation as the culmination of the same process by which it is proposed.[2]

More importantly, three of the four statutes, including ORS 222.170, expressly provide for the annexation of more properties than those whose owners consent to the annexation.[3] Indeed, the *sine qua non* of the statutes is to allow annexations without elections in circumstances where consent is obtained from specified *majorities* of the property

---

[2] The exception is ORS 199.490(2), which is part of a procedure that is more in the nature of an approval than a formalization.

[3] The exception is ORS 222.125, which comes into play when the owners of all property and more than half of the electors in the affected territory consent to the annexation.

or persons in the area to be annexed. Respondents' understanding that ORS 199.487(2) makes universal consent within the affected territory a condition precedent to annexation would put it in conflict with the basic operating prerequisites of the four statutes that it incorporates. Contrary to that understanding, we interpret ORS 199.487(2) to mean that the consents obtained pursuant to ORS 222.115 may count toward the majorities required by ORS 222.170 and the other incorporated statutes, and the phrase "for properties whose owners have signed such consents" to mean the properties upon whose consent or at whose instance[4] the annexation petitions or proposals are formulated. The phrase does not limit the territory that may be annexed to the specific properties for which consents have been given.

■       In their remaining assignment, respondents argue that LUBA erred in concluding that the city was not required to present an annexation plan to those persons whose consent was obtained in exchange for municipal services, as distinct from property owners or others whose consents were sought pursuant to ORS 222.170. LUBA explained:

> "[S]ome distinctions may be made between the requirements for petitions for annexation, consents to annexation obtained pursuant to ORS 222.170 and consents to annexation contained within contracts for service. In the first two cases, the persons consenting to the annexation are consenting based on the particular circumstances of the annexation, and whether the annexation serves their interests. In these cases, an annexation plan, which at the very least describes the boundaries of the area proposed to be annexed, must be provided to persons from whom consent is sought. *Skourtes*, 250 Or at 541.

> "The latter situation is a contract where the consent for annexation is consideration for the provision of a service that otherwise would not be made available to the property. Further, because the contracts are executed and services provided years, perhaps decades before annexation occurs, the scope of the 'consent' obtained is not specific to any particular annexation, but is a general consent to be annexed regardless of what other property is also annexed. Thus, no

---

[1] Unlike the other incorporated statutes, ORS 198.855 involves a petition procedure rather than city-initiated action supported by consents.

particular annexation plan must be provided prior to signing a contract for service that includes a consent for annexation."

Respondents rely on *Skourtes*, and argue that it does not support the distinction LUBA made or make any "exception for consents sought in the context of a contract" for municipal services. Respondents contend further that, before the 1991 Act was adopted, "Oregon law recognized no * * * form of consent" other than the kind contemplated by ORS 222.170, that that was true whether or not the consents were given in exchange for city services, and the "holding in *Skourtes* should apply with equal force."

In our view, respondents are partly right and partly wrong. *Skourtes* held that, under ORS 222.170, as it then read, there is an "implied" requirement that certain information be disclosed to persons whom a governmental body asks to consent to an annexation. It is important to emphasize that, notwithstanding its apparent moorings in policy considerations, the *Skourtes* opinion at least purports to be an exercise in statutory construction—specifically, of ORS 222.170. However, several years after *Skourtes* was decided, ORS 222.175 was enacted by the legislature. Or Laws 1985, ch 702, § 21. It now prescribes the "annexation plan" information that must be imparted to persons whose consents to an annexation are sought. Whether or not that statute does anything more or less than codify *Skourtes*, it supersedes the Supreme Court's decision; ORS 222.175 creates express statutory requirements that are akin to those that the court in *Skourtes* held were implicit in ORS 222.170.

ORS 222.115, the amendments to ORS 199.487(2), and the other provisions of the 1991 Act were adopted six years after the enactment of ORS 222.175. As we have noted in other connections, ORS 199.487(2) provides that consents obtained pursuant to ORS 222.115 may be used in formulating annexation proposals under ORS 222.170 (among other statutes), "notwithstanding * * * [*inter alia*] ORS 222.175[.]" Consequently, we conclude that respondents are incorrect, insofar as their assignment relates to consents in exchange for services that were given or agreed to after ORS 222.115 took effect.

However, respondents are correct in their argument that persons who consented to (or agreed to consent to) annexation in exchange for services before the enactment of the 1991 Act were entitled to be provided with an annexation plan as a prerequisite to the effectiveness of their consents. We agree with respondents that, before the enactment of ORS 222.115 and ORS 199.487(2), consents in exchange for city services, like others, were generally subject to ORS 222.170 *et seq*. Before 1985, the annexation plan requirement inhered in that statute as the court interpreted it in *Skourtes*; and after the 1985 enactment of ORS 222.175, the requirement was expressed in that statute. It remained applicable to consents in exchange for municipal services until the legislature made it inapplicable through the 1991 adoption of ORS 222.115 and amendment of ORS 199.487(2). Hence, it applies to all of the consents or contracts to consent that are involved here, except those that were procured after the effective date of the 1991 Act.

Although we have found errors in LUBA's analysis in response to both the petition and the cross-petition, our discussion of those problems serves only as guidance on remand. As we explained at the outset, the parties have not challenged various rulings of LUBA that, independently of the rulings that are challenged, support LUBA's disposition of this appeal.

Affirmed on petition and cross-petition.